Fecteau, J.
This is a petition filed on December 19, 2001, by the Commonwealth of Massachusetts pursuant to G.L.c. 123A, §1,12-15, claiming the respondent is a sexually dangerous person.[1] After the entry of an order of detention on December 20, 2001,[2] counsel was appointed on behalf of the defendant and a probable cause hearing was conducted on May 16, 2002 before the undersigned justice.[3] At that hearing, probable cause was found, the defendant was ordered examined under the committing statute and the matter was thereafter scheduled for trial.
The matter came on for trial on December 19-20,
2002, before me, sitting without jury.[4] The defendant elected to waive his right to a jury trial under the statute which was accepted by the court after colloquy with the defendant, finding that the waiver of his right *613 to a juiy trial was freely, voluntarily and knowingly given.
Upon consideration of the credible evidence, the following findings of fact and rulings of law are made.
FINDINGS OF FACT
The respondent, Hiram Gonzales (“Gonzales”), now age 63, was convicted of a “sex offense” within the meaning of G.L.c. 123A, §1,[5] after a plea of guilty in the Worcester Superior Court on April 4, 1989, to charges of unnatural rape of child (8 indictments) for which he received a sentence of ten to fifteen years in state prison, concurrent on each indictment. He had previously been convicted of a designated sexual offense, namely rape of child and indecent assault and batteiy on a child (3 indictments), having pleaded guilty to those offenses on December 17, 1986, and for which he received a “split” sentence of 10 years at MCI Concord, 1 year to be served, and the balance suspended and he was placed on a two-year period of probation.
Between the two sets of indictments, there were four separate victims, all of whom were unrelated to the defendant. The 1986 victims were children of friends of the defendant’s wife and those in 1988 were grandchildren of a woman with whom the defendant was then in an apparent relationship, he having been divorced from his wife following the 1986 charges. The victims ranged in age from 4 to 12 years of age; the three younger victims were female and the oldest, male. The offenses included multiple acts upon each victim, with some of the victims over the course of weeks or months, of digital, oral, anal and/or vaginal intercourse. The 1986 indictments referred to offenses that occurred in 1980 and in 1984. The 1988 offenses occurred during the summer of 1988, while the defendant was on parole and probation from the offenses to which he had pleaded guilty in 1986, and after he had obtained some treatment, both while incarcerated and thereafter. The 1988 victims also reported having been threatened by the defendant and shown a handgun. With the exception of the exhibition or use of a handgun, the defendant gave statements to police that admitted sexual contact with the victims.
The Commonwealth introduced the testimony of two “qualified examiners,” as defined in G.L.c. 123A, §1, Frederick Kelso, Ph.D. and Niklos Tomich, PsyD. Each of the Commonwealth’s experts testified credibly that, in their opinion, the defendant presently suffers from a “mental abnormality” as is required in the statutory definition of “sexually dangerous person”: “a congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons.” G.L.c. 123A, §1. Both experts for the Commonwealth found, after examination of documents related to the defendant’s case and after clinical interviews with the defendant, that the defendant suffers from “pedophilia,”[6] as such is defined in the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association, 4th Ed. (“DSM-IV-TR”). All experts who testified recognized the DSM-IV-TR as widely accepted in the psychological communiiy as a guide for psychological diagnostic criteria but all acknowledged that it was not intended to be utilized as simple checklists and adjustments may be made upon clinical judgment.[7] Indeed, it expresses a specific caution for forensic purposes: “the fact that an individual’s presentation meets the criteria for DSM-IV diagnosis does not carry any necessary implication regarding the individual’s degree of control over the behaviors that may be associated with the disorder. Even when diminished control over one’s behavior is a feature of the disorder, having the diagnosis in itself does not demonstrate that a particular individual is (or was) unable to control his or her behavior at a particular time.” Introduction to DSM-FV-TR, p. xxxiii.
The defendant introduced testimony also from two experts experienced in forensic psychology: Eric Brown. PsyD., and Joseph Plaud, Ph.D. Each were of the opinion that the defendant presently neither suffers from a mental abnormality or personality disorder, due primarily to the fact that there is no evidence that he presently suffers from deviant sexual arousal or has deviant interest in children. While the defense experts concede that the defendant would have qualified in 1988 as a pedophile, they disagree with the Commonwealth’s experts regarding his present mental state. The defendant’s experts opine that when the passage of time, his age, his incarceration and the treatment he has received are taken into consideration, he no longer suffers from pedophilia nor any mental abnormality or personality disorder, since there is no evidence that he continues to suffer from deviant sexual arousal. The defense experts also point to recent psychological literature that show marked drop in sexual recidivism after age 60. (Ex. 18.)
However, as Dr. Kelso points out in his report at p. 45, the DSM suggests, at p. 571, that the course of the abnormality is usually chronic, especially in those attracted to males. There is no evidence to conclude that the defendant is an exception, given the facts of the offenses and the defendant’s lack of significant disagreement with those facts.[8] Considering the evidence, I find that the defendant does presently suffer from a mental abnormality, namely pedophilia, and I do not credit opinions to the contrary.
The next critical issue for determination, then, is whether the defendant is likely, due to such abnormality, to engage in sexual offenses if not confined to a secure facility. In the recent case of Commonwealth v. Boucher, SJC-08845, decided December 17, 2002, the court held that the term “likely,” as such is used in connection with the statute in question, does not *614 mean “more likely than not” but rather “reasonably to be expected,” and that in “assessing the risk of reoffending, it is for the fact finder to determine what is ‘likely.’ Such a determination must be made on a case by-case basis, by analyzing a number of factors, including the seriousness of the threatened harm, the relative certainly of the anticipated harm, and the possibility of successful intervention to prevent that harm.”
It is the opinion of each expert called by the defendant that he does not present a likely risk of reoffense if not confined to a secure facility, even if the defendant could be diagnosed as a pedophile, as such is described in the diagnostic criteria of the DSM-IV-TR. The defense experts base their opinions upon the defendant’s present age of 63, that he has been incarcerated since 1989, that he has received some sex offender treatment while incarcerated, that he has not acted out sexually since his incarceration, that he has had relatively little disciplinary problems while incarcerated and there is no evidence that he continues to have deviant sexual interest in children. Moreover, each such witness expressed belief that the defendant would be released into an improved family structure around him, namely three adult children who are interested in him and that he is committed to continuing treatment and avoiding the presence of children. While results from the STATIC 99 actuarial testing showed a “medium high” risk of recidivism, both Drs. Plaud and Brown were of the clinical judgment that the case warranted a downward adjustment due to the dynamic factors pointed out by them.
Notwithstanding the protective nature of the factors upon which the defense experts relied as evidence of a low risk of sexual recidivism, Dr. Kelso and Dr. Tomich both believe and testified credibly that the defendant presents a current risk of a likelihood of reoffense. Among factors present and recognized by them as evidence of a high risk that the defendant will likely reoffend sexually, and which the court finds as significant to a likelihood of reoffense, is the fact that the defendant actually did reoffend in 1988 after having committed sexual offenses between 1980 and 1984, that the 1988 offenses were committed while the defendant was under active supervision by parole and probation and after having obtained some treatment, that there were more than one victim and that they were unrelated to the defendant, that there were both male and female victims, that there were multiple and divers acts of sexual offense, and that as the defendant got older, his sexual deviancy intensified in severity, and he acted on his deviant arousal to the point of ejaculation. Moreover, neither examiner believes that the defendant has obtained, either through incarceration alone or in combination with the treatment he has received, any real understanding and acceptance of his abnormality and the mechanisms that lead to his deviant arousal and his behavior associated with it. In addition, the defendant has misunderstood or minimized his sexually deviant conduct by suggesting it was due to alcohol abuse and stress in his marriage and that his sexual contact was somehow tolerated or expected by the victims due to his being a family friend. Both Commonwealth examiners also believe that Gonzales has little real or practical understanding of relapse prevention techniques and that he has a naive and inadequate plan upon release from confinement that includes living temporarily with one of his daughters, with whomhe had lived upon the occasions of his last release and reoffense. Although the defendant has been involved in the sex offender treatment program at various times and places while incarcerated, and while he may have suffered interruptions for factors not under his control and had some language limitations, he had not completed phase 3 of the 4-phase program. According to the examiners, until he has satisfactorily completed treatment, including the most intensive and important final phases, he has not and is likely not to develop sufficient knowledge and understanding of the factors, stresses and mechanisms that caused or contributed to his sexual deviancy and attraction to children, nor a sufficient plan to prevent relapse. Until then, he remains unable to control his deviant arousals and is a significant risk to re-offend.
I find that the testimony and opinions of the Commonwealth’s witnesses to be credible and compelling. I find, beyond a reasonable doubt, that the Commonwealth has proven that the defendant is a “sexually-dangerous person” as that is defined in G.L.c. 123A, § 1, in that he has been convicted of a sex offense and that he presently suffers from a mental abnormality which makes him likely to engage in sexual offenses unless confined to a secure facility.
ORDER OF COMMITMENT
For the foregoing reasons, I grant the petition of the Commonwealth and order the defendant to be committed to the Massachusetts Treatment Center, under the provisions of G.L.c. 123A, §14(d), for an indeterminate period of a minimum of one day to a maximum of his natural life until discharged pursuant to the provisions of §9 thereof.

 “Sexually dangerous person,” any person who has been (i) convicted of or adjudicated as a delinquent juvenile or youthful offender by reason of a sexual offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in sexual offenses if not confined to a secure facility; (ii) charged with a sexual offense and was determined to be incompetent to stand trial and who suffers from a mental abnormality or personality disorder which makes such person likely to engage in sexual offenses if not confined to a secure facility; or (iii) previously adjudicated as such by a court of the commonwealth and whose misconduct in sexual matters indicates a general lack of power to control his sexual impulses, as evidenced by repetitive or compulsive sexual misconduct by either violence against any victim, or aggression against any victim under the age of 16 years, and who, as a result, is likely to attack or otherwise inflict injury on such victims because of his uncontrolled or uncontrollable desires.

The respondent was due to be released from his period of incarceration on or about December 31, 2001.

While this justice is not of the opinion, nor were the attorneys, that a jury-waived trial must be conducted before a justice different than that who heard the case on probable cause, this subject was included, out of an abundance of caution, within the colloquy with the defendant, who assented to the case being heard by the undersigned.

Due to a scheduling conflict for one of the two defense experts, he was taken out of order during the Commonwealth’s presentation of evidence and who actually testified mid-way during the testimony of the first of the two Commonwealth experts.

“Sexual offense,” includes any of the following crimes: indecent assault and battery on a child under fourteen under the provisions of section thirteen B of chapter two hundred and sixty-five; indecent assault and battery on a mentally retarded person under the provisions of section thirteen F of chapter two hundred and sixty-five; indecent assault and battery on a person who has obtained the age of fourteen under the provisions of section thirteen H of chapter two hundred and sixty-five; rape under the provisions of section tweniy-two of chapter two hundred and sixty-five; rape of a child under sixteen with force under the provisions of section twenty-two A of chapter two hundred and sixty-five; rape and abuse of a child under sixteen under the provisions of section twenty-three of chapter two hundred and sixty-five; assault with intent to commit rape under the provisions of section twenty-four of chapter two hundred and sixty-five; assault on a child with intent to commit rape under section 24B of chapter 265; drugging persons for sexual intercourse under section 3 of chapter 272; unnatural and lascivious acts with a child under the age of sixteen under the provisions of section thirty-five A of chapter two hundred and seventy-two; and any attempt to commit any of the above listed crimes under the provisions of section six of chapter two hundred and seventy-four.

The diagnostic criteria for pedophilia include;
A. Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 or younger).
B. The person has acted on these sexual urges, or the sexual urges or fantasies cause marked distressor interpersonal difficulty.
C. The person is at least age 16 years and at least 5 years older than the child or children in Criterion A.
DSM-IV-TR, p. 572.

Indeed, the “DSM-IV-TR” itself qualifies its intended use. “The specific diagnostic criteria included in DSM-IV are meant to serve as guidelines to be informed by clinical judgment and are not meant to be used in a cookbook fashion. For example, the exercise of clinical judgment may justify giving a certain diagnosis to an individual even though the clinical presentation falls just short of meeting the full criteria for the diagnosis as long as the symptoms that are present are persistent and severe.” Introduction, p. xxxii.

The only disagreement of significance that the defendant expressed to the examiners, as he had done with police, was his denial that he had used a handgun to threaten the victims in the 1988 offenses.